CLERK'S OFFICE
A TRUE COPY
Sep 30, 2025
s/ MMK
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF WISCONSIN

In the Matter of the Seizure of
(Address or brief description of property or premises to be seized)

THE USDT TOKENS AT THE FOLLOWING VIRTUAL CURRENCY ADDRESS: TXdWxECkrVSSWt7Pgy37iUdhDJzLSLN6VW

Case Number: 25 MJ 184

## APPLICATION FOR A WARRANT TO SEIZE PROPERTY SUBJECT TO FORFEITURE

I, Nicholas Schlereth, being duly sworn depose and say:

I am a Special Agent with the United States Secret Service, and have reason to believe that in the British Virgin Islands there is now certain property, namely, the USDT tokens currently associated with virtual currency address TXdWxECkrVSSWt7Pgy37iUdhDJzLSLN6VW, that is civilly forfeitable under 18 U.S.C. §§ 981(a)(1)(A), 981(a)(1)(C) and 984, including cross-references to 18 U.S.C. §§ 1956(c)(7) and 1961(1), and criminally forfeitable under 18 U.S.C. §§ 981(a)(1)(C) and 982(a)(1) in conjunction with 28 U.S.C. § 2461(c), as funds that (1) are traceable to, and are therefore proceeds of, specified unlawful activity, namely, wire fraud in violation of 18 U.S.C. § 1343; and (2) are involved in, or are traceable to funds involved in, money laundering offenses in violation of 18 U.S.C. § 1956, and which property is therefore also subject to seizure for purposes of civil forfeiture under 18 U.S.C. § 981(b) and for purposes of criminal forfeiture under 18 U.S.C. § 982(b)(1) and 21 U.S.C. § 853(f).

The application is based on these facts:

✓ Continued on the attached sheet.

❑ Delayed notice of ____ days (give exact ending date if more than 30 days:__________ is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

NSCHLERETH Digitally signed by NSCHLERETH Date: 2025.09.29 12:53:50 -04'00'

Signature of Affiant
Nicholas Schlereth, SA, USSS

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone and email.

09/30/2025 at 2:30 p.m.
Date and time issued

at Milwaukee, Wisconsin
City and State

William E. Duffin, U.S. Magistrate Judge
Name & Title of Judicial Officer

Signature of Judicial Officer


Case 2:25-mj-00184-SEALED* Filed 09/30/25 Page 1 of 20 Document 1

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEIZURE WARRANT

I, Nicholas Schlereth, have been duly sworn on oath, state as follows:

### Affiant's Background

1. I am a Special Agent with the United States Secret Service ("USSS"). I have been so employed since 2021. I am a member of the USSS's Criminal Investigative Division/Global Investigative Operations Center. As part of my duties as a USSS Special Agent, I investigate violations related to cyber, mail, wire and bank fraud, as well as identity theft. I have received training in conducting criminal investigations, including physical and electronic surveillance, interviewing witnesses, and executing search and seizure warrants.

2. I have received over 1,200 hours of training in network intrusion response, money laundering and asset forfeiture, and cryptocurrency investigations offered through the Federal Law Enforcement Training Center and the United States Secret Service. I have received advanced training in for cryptocurrency related investigations and am the subject matter expert (SME) for cryptocurrency in the Criminal Investigative Division. I perform investigations involving both domestic and international subjects that utilize electronic devices and the financial infrastructure in the furtherance of criminal violations.

### Property to be Seized and Basis for Seizure

3. I submit this affidavit in support of an application for a warrant to seize the USDT[1] tokens at virtual currency address **TXdWxECkrVSSWt7Pgy37iUdhDJzLSLN6VW** (**TARGET ADDRESS**, hereinafter also referred to as **N6VW**).[2]

---

[1] USDT (also known as Tether) is a stable coin cryptocurrency with a value meant to mirror the value of the U.S. dollar. USDT tokens are backed by offshore banks. Offshore banks offer fewer charges for operation and tax benefits, but they aren't always fully secure like the FDIC-insured U.S. banks.

[2] For ease of reading, all cryptocurrency addresses identified within this affidavit have been abbreviated to the last 4 characters and are marked in bold font.

4. For the reasons set forth below, I submit that the funds held in the **TARGET ADDRESS** are:

a. Funds traceable to, and are therefore proceeds of, a wire fraud scheme in violation of 18 U.S.C. § 1343, and therefore are subject to civil forfeiture under 18 U.S.C. § 981(a)(1)(C), including cross-references to 18 U.S.C. §§ 1956(c)(7) and 1961(1), and subject to criminal forfeiture under 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c);

b. Funds involved in, or traceable to property involved in, money laundering offenses, in violation of 18 U.S.C. §§ 1956, and therefore are subject to civil forfeiture under 18 U.S.C. §§ 981(a)(1)(A) and 984, and subject to criminal forfeiture under 18 U.S.C. § 982(a)(1); and

c. Subject to seizure via a civil seizure warrant under 18 U.S.C. § 981(b)(2) and via a criminal seizure warrant under 18 U.S.C. § 982(b)(1) and 21 U.S.C. § 853(f).

**Cryptocurrency Definitions**

5. Cryptocurrency Exchange: A business that allows customers to trade cryptocurrencies or digital currencies for other assets, such as conventional fiat money or other digital currencies. Exchanges may accept credit card payments, wire transfers or other forms of payments in exchange for digital currencies or cryptocurrencies.

6. Cryptocurrency: A type of virtual currency in a decentralized, peer-to-peer network medium of value or exchange that may be used as a substitute for fiat currency to buy goods or services, or exchanged for fiat currency or other cryptocurrencies. Individuals can obtain cryptocurrency through exchanges and other intermediaries, person-to-person transfers, the sale of

goods or services, or mining. There are thousands of cryptocurrencies including Bitcoin ("BTC"), Circle ("USDC"), and Tether ("USDT").

7. Coinbase: A secure online cryptocurrency exchange where an individual can buy, sell, transfer and store cryptocurrency whose registration shows that Coinbase is located in San Francisco, CA.

8. Fiat Currency: Coin and paper money of a country that has legal tender.

9. Blockchain: Most cryptocurrencies have a "Blockchain," which is a decentralized, typically public, transaction ledger containing an immutable and historical record of every transaction involving the cryptocurrency. Some cryptocurrencies operate on Blockchains that are not transparent or have built-in protocols designed to conceal transactional information in the furtherance of money laundering making it difficult to trace or attribute transactions. Though the public ADDRESS of those engaging in cryptocurrency transactions are recorded on a blockchain, the identities of the individuals or entities are not recorded on these public ledgers.

10. Blockchain Analysis: The process of inspecting, identifying, clustering, modeling and visually representing data on a cryptographic distributed ledger, known as a Blockchain. Data in most Blockchains is public, meaning anyone can view the contents. The goal of Blockchain analysis is discovering useful information about the different actors transacting in cryptocurrency by using open source and/or subscription analytical tools, such as "Chainalysis" and/or "TRM," to determine what transactions were conducted by that individual or entity. Cryptocurrency transactions are sometimes referred to a "pseudonymous," meaning that they are partially anonymous.

11. Transaction Hash: A unique string of characters that is given to every transaction that is verified and added to the Blockchain.

12. Wallet: A wallet is a software program that interfaces with the Blockchain and generates and stores public and private keys used to send and receive cryptocurrencies. A wallet can have one or more cryptocurrency address(es) that are controlled by the same individual or entity.

13. Bitcoin/Cryptocurrency Address: A public address, which is represented as a case-sensitive string of letters and numbers, is akin to a bank account number, and a private key is a cryptographic equivalent of a Personal Identification Number (PIN) or password.

14. Crypto Confidence Scam: A crypto confidence scam is rooted in investment/securities fraud. While it may start with elements of a romance scam, the goal is to obtain as much money from a victim as possible through fake cryptocurrency investment platforms. The suspect offers the victim high returns for their investment and directs the victim to a custom created website that appears to be legitimate. Once the victim makes the initial "investment," the fake platform shows substantial gains, which leads the victim to invest more funds. When the victim ultimately tries to withdraw funds from the investment platform, they are told they must pay a tax. Even after paying the tax, the suspect usually comes up with another fee or aspect to get more funds from the victim. The same process continues until the victim realizes that they have been scammed and stops sending additional funds.

15. Stablecoins: Stablecoins are a type of virtual currency whose value is pegged to a commodity's price, such as gold, or to a fiat currency, such as the U.S. dollar, or to a different virtual currency. For example, USDC is a stablecoin pegged to the U.S. dollar. Stablecoins achieve their price stability via collateralization (backing) or through algorithmic mechanisms of buying and selling the reference asset or its derivatives.

16. Tether (USDT): Tether Limited ("Tether") is a company that manages the smart contracts and the treasury (i.e., the funds held in reserve) for USDT tokens.

17. Circle (USDC): Circle is a corporation that produces and issues USDC coin. USDC is defined as a stablecoin and is backed by a variety of reserves to support the USDC circulation. Circle maintains a value of 1:1 with the U.S. Dollar. Circle also maintains "the Mint," where a consumer can convert local currency to USDC.

18. Bridge: A bridge is a decentralized finance (DeFi) protocol allowing for users to swap one coin to another, as well as change the blockchain in which they are operating. An example would be a change from Bitcoin to USDT via a bridge. Bitcoin operates on the Bitcoin blockchain and USDT operates primarily on the Ethereum and TRON blockchains.

19. Decentralized Finance (DeFi): Decentralized Finance is a synonymous term for digital assets and cryptocurrency. Decentralized Finance does not interact with a bank or central authority that can provide surveillance or governance over transactions.

20. Application Programming Interface (API): The application programming interface is utilized by individuals who want to leverage a larger exchanges trading capabilities, often for a smaller exchange nested within the larger exchange.

21. Tron Network: The Tron network is a cryptocurrency network similar to the Ethereum network, that operates based on smart contracts. Digital assets like USDT can operate on the Tron network if they are TRC20 tokens. A TRC20 token is the standard for the implementation of a smart contract on the Tron blockchain. TRC20 tokens are designed to only operate on the Tron blockchain and can only be transferred to another blockchain network via a bridge. Transactions on the Tron network require Tron to be the "gas," the requisite fees, for each transaction.

22. Smart Contract: A smart contract is logic-based code that governs the transactions of digital assets on a blockchain. The code can include various features like the execution of a swap from one token to another, or the hopping from one blockchain to another, e.g. Ethereum to Tron.

23. Transaction Fee ("Gas"): A transaction fee is a fee paid by the party sending virtual currency on a blockchain to reward miners and/or validators for verifying and validating transactions. Transaction fees vary by blockchain and can fluctuate based on factors such as blockchain network traffic and transaction sizes. Senders of virtual currency can increase the transaction fees that they pay to have their transactions confirmed faster by miners and/or validators. Transaction fees are generally paid in a blockchain's native token (*e.g.*, Bitcoin on the Bitcoin blockchain). On the Ethereum network, these transaction fees are called "gas fees." Gas fees are transaction costs paid in Ether ("ETH"), or its fraction, gwei. These fees serve as a form of remuneration for validators who maintain and secure the network. Gas fees fluctuate based on supply, demand, and network capacity, and may increase during periods of network congestion.

24. THOR Swap: THOR Swap is a digital asset protocol that enables the swapping of Bitcoin to ERC20 Tokens on the Ethereum blockchain. When THOR Swap is utilized, an OP Return is produced, providing the receiving address for the swapped assets.

25. OP Return: An OP Return is language encoded onto the blockchain as part of a Bitcoin transaction. It is often synonymous with a memo line on a check.

26. Based on my training and experience, I know that although cryptocurrencies such as Bitcoin and Tether have legitimate uses, cryptocurrency is also used by individuals and organizations for criminal purposes such as money laundering and is often used as payment for illegal goods and services. By maintaining multiple address and/or wallets, those who use

cryptocurrency for illicit purposes can attempt to thwart law enforcement's efforts to track transactions.

**Statement of Probable Cause – Eastern District of Wisconsin Victim - J.F.**

27. In this case, unknown Subject(s) directed a victim located within the Eastern District of Wisconsin to transfer approximately $746,700 in cryptocurrency to a fake investment platform "Bittrade" at the domain www.btwsxe.top. As explained below, the Subjects also used this website to deceive other victims into sending their cryptocurrency to the Subjects under the guise of investment.

28. On February 26, 2025, the United States Secret Service was notified of a cryptocurrency scam victim, J.F., known to your affiant, who resides in the Eastern District of Wisconsin, including during the events listed below. J.F. was interviewed by the Outagamie, Wisconsin Sheriff's Office and USSS shortly thereafter, as detailed in the following paragraphs.

29. J.F. stated that on December 18, 2024, J.F. received a text message from an unknown phone number (323-713-2303), but the individual identified themselves as Luna ANDERSON. J.F. stated the conversations moved from standard text messages to WhatsApp after a few days from the initial text message.

30. J.F. stated ANDERSON approached him about cryptocurrency investments. ANDERSON stated she was a part owner with a 17% share of the Bienstock Group in Los Angeles, California. Open-source research indicates the Bienstock Group is a real estate group, but there is nobody named Luna ANDERSON shown on Bienstock Group website www.thebienstockgroup.com.

31. J.F. stated that J.F. was directed by ANDERSON to transfer funds from J.F.'s bank to Coinbase, convert the U.S. dollars to BTC, and transfer the BTC to the Bittrade platform at

addresses 61ap and NPGQ. Believing this to be a legitimate investment platform, J.F. followed the directions. Between December 23, 2024, and January 21, 2025, J.F. sent $746,700 to J.F.'s Coinbase account, purchased BTC, and transferred the BTC to addresses 61ap and NPGQ in 4 separate transactions, as set forth in the table below.

| Date/Time (UTC) | Amount (BTC) | Transaction Hash | Sending Address | Receiving Address |
|---|---|---|---|---|
| 12/23/24 at 20:12 | 0.053558 | 2b9ef8e30aeb4192cc82c568d114d5ad2 0b8f7a45deb28cc0da4489c91898c68 | bc1q89dyyqy3z4fehyye0e0 jdm86u7zl2ja59dy62x | 1LJTWgfWz7hRX5bj2cf3qPna5 audTT61ap |
| 01/02/25 at 21:57 | 0.996637 | ea97d63521a1db1187fdecbfd6a74f69f4 04cf7821a5de3fbac7c5a762c4c403 | bc1q89dyyqy3z4fehyye0e0 jdm86u7zl2ja59dy62x | 1DLfQ129RY8QSkUZjgxPBoG Bfwx1r2NPGQ |
| 01/09/25 at 01:50 | 2.994858 | 4359ee55dde42bcd1a3a4902a565bb76 08dcf0b2904739bf12170ab2740f5e0b | bc1q89dyyqy3z4fehyye0e0 jdm86u7zl2ja59dy62x | 1DLfQ129RY8QSkUZjgxPBoG Bfwx1r2NPGQ |
| 01/21/25 at 19:26 | 3.264309 | e82a7fa2b41fde74494e0b21ddd2079c1 813efafc1f4ab93e7b7e97eda8646f7 | bc1q89dyyqy3z4fehyye0e0 jdm86u7zl2ja59dy62x | 1DLfQ129RY8QSkUZjgxPBoG Bfwx1r2NPGQ |

*Table 1*. J.F. Transfers from Coinbase to Bittrade (btwsxe.top):

32. On February 7, 2025, J.F. stated he saw his investment grow to over 2,222,555.22 USDT inside the Bittrade platform and wanted to withdraw his funds. J.F. stated Bittrade informed him he would have to pay taxes on his investment, totaling $803,042.96. *See* Image 1 for the formula equaling the total tax calculated on the gains. J.F. was told he could pay the taxes in either U.S. Dollars or BTC.




*Image 1: Tax Calculation*

33. J.F. stated that on February 11, 2025, the Bittrade domain changed from btwsxe.top to btrlapqidr.top. J.F. also stated he was directed to the "Bitcoin Trading Customer Service" for Bittrade on Telegram. At the time of this affidavit, Bittrade did not return assets to J.F.

**<u>Victim J.F. Cryptocurrency Tracing</u>**

34. Using commercial blockchain tracing tools and the Last In, First Out (LIFO) accounting principle, I traced a portion of J.F.'s cryptocurrency from the initial deposit address

provided by ANDERSON to the **TARGET ADDRESS**.[3] Because these funds were obtained from J.F. through a wire fraud scheme the funds are subject to seizure as proceeds, or property derived from proceeds, of the scheme. Additionally, as described below, J.F.'s funds were moved through numerous addresses and commingled with additional funds in an attempt to conceal their origin and ownership. As such, these comingled funds are also property involved in money laundering and, thus, subject to seizure.

35. The transactions described below in Paragraphs 36-47 follow one of J.F.'s initial deposits to Bittrade. These transactions are also graphically depicted in Image 2. Based on the analysis above, J.F.'s other three deposits followed similar paths and J.F. did not direct or have control over any of the transactions after the initial deposits.

36. On January 21, 2025, at the direction of ANDERSON, J.F. sent 3.264316 Bitcoin (BTC) to the Bittrade subjects at deposit address NPGQ. At the time of the transfer, the U.S. Dollar equivalent was $345,863.00.

37. Continuing on January 21, 2025, address NPGQ sent 3.489970 BTC to address 9pzx.

38. Continuing on January 21, 2025, address 9pzx sent 3.489949 BTC to address DrXa.

39. On January 22, 2025, address DrXa sent 5.665678 BTC to address Dcae.

40. Continuing on January 22, 2025, address Dcae sent 2.8 BTC to address 1nzF.

41. Continuing on January 22, 2025, address 1nzF sent 2.8 BTC to the address 8yly. The address 8yly is a deposit address to Thor Swap, a swapping service to convert Bitcoin to ERC20 tokens for use on the Ethereum blockchain. The BTC was converted to Tether (USDT). The

[3] While the commercial blockchain tracing tools have proven reliable and are therefore frequently used by law enforcement, all tracing conducted in this case was also validated using the publicly available blockchain, which can be accessed via the internet.

Op Return for the transaction provided the corresponding address for the USDT (0x498f749ca05ef83f7c5ee8ec11b9cf09af151a21).

42. Continuing on January 22, 2025, address 1a21 sent 292,069.107526 USDT (the USDT obtained from the swap of 2.8 BTC) via the Ethereum network to address 32e3.

43. Continuing on January 22, 2025, address 32e3 sent 320,000 USDT to address b87a.

44. Continuing on January 22, 2025, address b87a sent 320,000 USDT, spread across four transactions of 80,000 USDT to the address d1c9. The address d1c9 is a deposit address for the Bitkeep bridge, maintained by the custodial exchange, Bitget.

45. Continuing on January 22, 2025, address 713M sent 319,003.136167 USDT[4], across four transactions, to address w3A3. The address 713M is associated to the Bitkeep Bridge and is an exit address on the Tron network. Based on the Bridge activity, the outflow of assets from the bridge will get sent to a different address. A bridge swaps (bridges) assets from one blockchain to another blockchain.

46. Continuing on January 22, 2025, address w3A3 sent 319,003.136167 USDT to the address E1XG.

47. Continuing on January 22, 2025, address E1XG sent 300,000 USDT to the **TARGET ADDRESS**.

[4] The USDT decreased slightly due to transaction fees.


bc1q89dyyqy3z4fehyye0e0jdm86u7zl2ja59dy62x
Date: 01/21/2025
Time: 19:26 UDT
Amount: 3.264316 BTC
1DLfQ129RY8QSkUZjgxPBoGBfwx1r2NPGQ
Date: 01/21/25
Time: 20:33 UDT
Amount: 3.489970 BTC
bc1prd4ufv7lq9v0u0cjuqwelqaxk5c5lgtsk8skszgg3xynqqwvzlvsr09pzx
Date: 01/22/25
Time: 01:41 UDT
Amount: 3.489949 BTC
1EEAL9gtKUCD898dPA6fTdT8sYdosVDrXa
Date: 01/22/25
Time: 08:05 UDT
Amount: 5.665678
1AUpNGTMtjL66eGAzCgDXuSyuv5vmDcae
Date: 01/22/25
Time: 09:11 UDT
Amount: 2.800000 BTC
34vxwKnca6TnNH92c4RrQjotpvZ7fd1nzF
Date: 01/22/25
Time: 09:15 UDT
Amount: 2.800000 BTC
bc1qutu2y83gna5l2k0egedztfv6zejfwgd4my8yly
THOR Swap
Swap from BTC to USDT (ETH)
Date: 01/22/25
Time: 10:41 UDT
Amount: 292,069 USDT
0x863503750f8317269da04895e578f09ce9ea32e3
Date: 01/22/25
Time: 15:20 UDT
Amount: 320,000 USDT
0x6e9775e5c997351d7771d6dc753d572b2b40b87a
Date: 01/22/25
Time: 15:40 UDT
Amount: 320,000 USDT
0x11235534a66a33c366b84933d5202c841539d1c9
Bitkeep Bridge
Swap from USDT (ETH) to USDT (TRON)
TH8tNBq1NJPfDdDksEaeQPjYsL9KCW713M (TRON Outflow Address)
Date: 01/22/25
Time: 15:43 UDT
Amount: 319,003 USDT
TBNp1v9GMgGT3QULb3gnaBXB8WsjfMw3A3
Date: 01/22/25
Time: 15:51 UDT
Amount: 319,003 USDT
TJSk6Y4zwPjFLWp3PWyYch6m3hgQsWE1XG
Date: 01/22/25
Time: 16:00
Amount: 300,000 USDT
TXdWxECkrVSSWt7Pgy37iUdhDJzLSLN6VW

*Image 2*

48. On February 27, 2025, Sgt. Sheldon Pedranzan – Outagamie County Sheriff's Office, notified the USSS that Tether froze the **TARGET ADDRESS** based on the receipt of fraud proceeds. Tether agreed to freeze the USDT assets associated with the **TARGET ADDRESS**. As part of the freeze, Tether directed all claimants to contact Sgt. Pedranzan for more information.

49. Based on the LIFO accounting model, 292,069.107526 USDT contained within **TARGET ADDRESS** are attributed to J.F.'s deposits to the Bittrade platform, including the transaction detailed above. As of April 20, 2025, the **TARGET ADDRESS** contained 816,955.838899 USDT.

50. As noted above, the tracing described in this section follows only one of J.F.'s four initial deposits. J.F.'s other deposits were similarly commingled with other digital assets in many other addresses associated with the scheme, including some of the addresses through which the Target Funds flowed. J.F.'s other deposits were commingled with other digital assets partially utilizing the THOR Swap, but went to different avenues landing at other exchanges, like Binance and MaskEx.

51. J.F.'s three other initial deposits did not all end up in the same **TARGET ADDRESS**. Based on my training and experience, I know that it is highly common for suspects to move funds across multiple addresses, comingling them with other funds, swapping to different coins, and possibly swapping to other blockchains. Funds move in rapid succession from address to address, including using services like Bridgers, ThorSwap, and others that enhance the obfuscation of assets. Accordingly, based on my training and experience, I believe that the **TARGET ADDRESS** and other addresses involved in the rapid succession of movement of the victim funds were used to conceal the nature, source, and location of criminal proceeds.

## Additional Victim Identification and Investigation

52. The Bittrade domain that J.F. invested through was also reported as a fraudulent cryptocurrency investment portal in numerous incidents within the Federal Trade Commission's Consumer Sentinel database. As of April 20, 2025, there were 34 such complaints with a total loss amount of $818,207. The complainants discussed a similar scheme of being contacted by a wrong number, having an attractive female send pictures of herself and discussing cryptocurrency. Complainants stated they saw large profits immediately after trading and when they wanted to withdraw their profits, they were told they had to pay taxes.

53. Similarly, a search of the FBI's IC3.gov database found that, as of April 20, 2025, 15 individuals reported as being the victim of an investment scam involving Bittrade, resulting in a total financial loss of $1,731,360. All of these reports followed the same pattern as J.F.'s incident.

54. A Domain Name Server (DNS) inquiry was conducted on the domain btwsxe.top and btrlapqidr.top. The domain, btwsxe.top was registered on December 16, 2024, by the registrar company, Shanghai Meicheng Technology Information Development Co Ltd (SMTIDCL), had other domains registered to the same IP address. Based on my training and experience, domains involved in an investment fraud scheme, registered at SMTIDCL, are usually associated to fraud schemes, especially when associated to ".top" domain endings.

55. A DNS inquiry was conducted on the domain btrlapqidr.top. The domain, btrlapqidr.top was registered February 11, 2025, by the registrar company, SMTIDCL. The domain was hosted with other domains in a variety of IP addresses, initially being seen at 18.220.212.66. The IP address resolves to Amazon AWS, indicating SMTIDCL utilized Amazon AWS as infrastructure for its company.

**Claimants' Inquiries Regarding Frozen Funds and Evidence of Multiple Subjects**

86. On March 3, 2025, Sgt. Pedranzan was contacted by a someone inquiring about why the funds in the **TARGET ADDRESS** were frozen. The person did not identify themself but contacted from the email address yuanbao586898@gmail.com. The email was accompanied with the Chinese name: 元宝. Utilizing Google Translate, the name 元宝 was translated to Yuan Bao.

87. Continuing on March 3, 2025, I advised Sgt. Pedranzan he could contact BAO and ask the following questions:

a. Full Name

b. Address

c. Phone Numbers (including WhatsApp)

d. Any exchanges utilized for cryptocurrency transactions

e. Occupation

f. Source of funds in the frozen address

g. Provide an image of identification (passport or government ID)

88. Sgt. Pedranzan stated he was not contacted again by BAO.

89. On July 16, 2025, Sgt. Pedranzan stated he received an email from two email addresses: (1) nomsesgyeu@gmail.com and (2) hh1446538068@gmail.com. The email addresses were not the original ones provided by Tether as claimants establishing contact regarding a frozen address. Sgt. Pedranzan stated the emails were in what appeared to be Chinese. Below is an image of the language, translated using Google Translate sent to Sgt. Pedranzan. Sgt. Pedranzan responded to the emails asking for their contact information and source of funds, with no response from the subjects, except for attempts to try and barter for the release of the funds, as witnessed in the image.




90. In the message sent to Sgt. Pedranzan, "Black U" is mentioned as being a source of funds. Open-source research indicates Black U is a mixing service. The Black U mixer is associated to the Lazarus Group, which is a state sponsored North Koren money laundering organization.

## <u>Seizure Procedure for the Target ADDRESS</u>

91. Should this seizure warrant be granted, law enforcement intends to work with Tether to seize the funds associated with the **TARGET ADDRESS**. In sum, the accompanying warrant would be transmitted to Tether, at which time Tether would "burn" (*i.e.*, destroy) the **TARGET ADDRESS** (and by extension the USDT tokens associated with them). Tether would then reissue the equivalent amount of USDT tokens associated with the **TARGET ADDRESS** and transfer those funds to a government-controlled wallet. Those funds would remain in the custody of the U.S. government during the entire pendency of the forfeiture proceedings, to ensure that access to, or manipulation of, the forfeitable property cannot be made absent court order or, if forfeited to the United States, without prior consultation by the United States.

92. I submit that a restraining order under 21 U.S.C. § 853(e) may not be sufficient to assure the availability of the funds for forfeiture because I have been advised of cases in which, even after a restraining order or similar process has been issued to a financial institution, the funds sought to be restrained were not effectively restrained by the financial institution. In my judgment,

a seizure warrant would be the most effective way to assure the availability of the money sought to be seized for forfeiture.

**<u>Conclusion</u>**

93. Based upon all of the foregoing, there is probable cause to establish the **TARGET ADDRESS**, maintained by Tether Limited Incorporated ("Tether"), received proceeds of a wire fraud scheme and the **TARGET ADDRESS** is property traceable wire fraud, in violation of Title 18, United States Code, Section 1043, et. seq., and/or the **TARGET ADDRESS** was used to commit concealment money laundering transactions, in violation of Title 18, United States Code, Section 1956, and that the USDT held in the **TARGET ADDRESS** was involved in the money laundering conduct.

94. Wire Fraud: Title 18, United States Code, Section 1343, makes it a crime to knowingly execute, or attempt to execute, a scheme or artifice to (1) obtain money or property by means of false or fraudulent pretenses, representations, or promises; (2) that are material; (3) with the intent to defraud; and (4) where the defendant used, or caused to be used, a wire communication to carry out or attempt to carry out an essential part of the scheme.

95. Money Laundering: Title 18, United States Code, Section 1956 makes it unlawful, in part, to conduct a financial transaction, knowing that the property involved in the financial transaction represents the proceeds of some form of specified unlawful activity, knowing that the transaction is designed in whole or part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity.

96. As of September 20, 2025, the **TARGET ADDRESS** had a current balance of 816,955.838899 USDT. The **TARGET ADDRESS** has been frozen since this date.

97. The Court has authority to issue seizure warrants for property located outside the Eastern District of Wisconsin, pursuant to Title 18, United States Code, Section 981(b)(3). Section 981(b)(3) provides that a seizure warrant may be issued by a judicial officer in any district in which a forfeiture action may be filed under Title 28, United States Code, Section 1355(b), "and may be executed in any district in which the property is found. . . ." Title 18 U.S.C. § 981(b)(3). In turn, Title 28, United States Code, section 1355(b) provides that a forfeiture action may be brought in any district where any of the underlying acts or omissions occurred upon which the forfeiture based.



Case 2:25-mj-01840-WED *SEALED* Filed 09/30/25 Page 19 of 20 Document 1

## ATTACHMENT A

Pursuant to this warrant, Tether shall provide the law enforcement officer/agency serving this document with the equivalent amount of USDT tokens that are currently associated with the virtual currency address referenced below (*i.e.*, all items of value, including 816,955.838899 USDT in **TARGET ADDRESS)**. Tether shall effectuate this process by (1) burning the USDT tokens currently associated with the virtual currency addresses referenced below and (2) reissuing the equivalent value of USDT tokens to a U.S. law enforcement-controlled virtual currency wallet. Tether shall provide reasonable assistance in implementing the terms of this seizure warrant and take no unreasonable action to frustrate its implementation.

**Target Address to Be Seized:**

**TXdWxECkrVSSWt7Pgy37iUdhDJzLSLN6VW**